Vinie BERTAUT and John Bertaut

v.

UNITED STATES of America.

No. 91–4215.

United States District Court,
E.D. Louisiana.

March 30, 1994.

Viki Williams Lovelace, Metairie, LA, J. Michael Rhymes, Richard Lee Fewell, Jr., Monroe, LA, for plaintiffs.

Martin K. Banks, U.S. Dept. of Justice, Torts Branch, Washington, DC, Joan Elaine Chauvin, U.S. Atty.'s Office, New Orleans, LA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McNAMARA, District Judge.

This matter was tried to the Court without a jury on March 21 and 22, 1994. Now, after considering the evidence and the memoranda of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

1. This action is brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., by Plaintiffs, Vinie Bertaut and John Bertaut, for the acts and omissions of the United States under the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(j)–(*l*).

2. The Swine Flu Immunization Program was enacted into law by Congress and the President in 1976 on an emergency basis in an effort to avoid a potential flu epidemic.

3. The testimony and evidence showed by a preponderance of the evidence that Plaintiff, John Bertaut, received the swine flu vaccination on December 7, 1976. (*See* Trial Exhibit No. A–5). This Plaintiff does not claim that he had any ill side effects from this vaccination.

4. The Court defers on ruling whether Plaintiff, Vinie Bertaut ("Mrs. Bertaut"), proved by a preponderance of the evidence whether she actually received the swine flu vaccination in November or December 1976 as she alleges.[1]

---

1. The court notes that the testimony of **Gwendolyn Booth** (Nursing supervisor of the St. Tammany Parish Health Unit where Mrs. Bertaut allegedly received the swine flu vaccination) and **Bernadette McClellon** (Head nurse of the St. Tammany Parish Health Unit) does not support Mrs. Bertaut's contention that she received the swine flu vaccination at the health unit on December 7, 1976 because:

(1) a search of all consent forms regarding the swine flu vaccinations located *Mr.* Bertaut's signed consent form (Trial Ex. A 6), but failed to locate *Mrs.* Bertaut's signed consent form even though the Bertauts claim that they received the vaccination at the *health unit* on the same day, i.e., December 7, 1976;
(2) Mr. Bertaut's signed consent form indicates that he received the "monovalent" form of the vaccine, which was only given at *mass*

524

5. While Mrs. Bertaut allegedly received the swine flu vaccine in November or December 1976, she did not file this lawsuit until November 15, 1991. (Mrs. Bertaut previously filed an administrative complaint on March 20, 1991 and it was denied on May 16, 1991. *See* Trial Exs. A–10 & 11). However, the Court also defers ruling on whether this lawsuit is barred by the two years statute of limitations set forth in 28 U.S.C. § 2401(b).[2]

6. Guillain–Barre Syndrome ("GBS") is a medical condition referring to the destruction of insulation around the peripheral nerves causing them to become dysfunctional; this process is known as demyelination.

7. Mrs. Bertaut claims that she had an acute episode of GBS in December 1976 and several recurring episodes of GBS in subsequent years. However, even if Mrs. Bertaut received the swine flu vaccine as she alleges *and* her claim is not time barred, the court nevertheless finds that Plaintiff has failed to prove by a preponderance of the evidence that she developed either acute or chronic recurring GBS, much less that she developed GBS as a result of allegedly receiving the swine flu vaccine.

8. The mere "possibility" (which is what the evidence shows) that Mrs. Bertaut developed any acute or chronic recurring GBS from any cause, known or unknown, is legally insufficient to meet her burden of proof.

9. The mere "possibility" (which is what the evidence shows) that Mrs. Bertaut developed acute or chronic recurring GBS as a

---

*sites, such as schools.* The "bivalent" form of the vaccine was given at the health unit but only to the elderly or high risk population, such as handicapped children or persons with doctors' orders. The "bivalent" form was also administered at nursing homes to the residents of the nursing homes. In December 1976, Mrs. Bertaut was 28 years old.

(3) Both Mr. and Mrs. Bertaut testified that they received the swine flu vaccination through a "needle" injection. However, the "monovalent" form of the vaccine (which is the kind Mr. Bertaut received according to his consent form) was administered only by "air" injection;

(4) If a person received the vaccination at a *mass site*, as opposed to the health unit, the person's "pink vaccination/immunization card," which is kept at the health unit would *not* have been marked. On the other hand, if a person received the vaccination at the *health unit*, the person's "pink vaccination/immunization" card would have been marked.

(5) Neither Mr. nor Mrs. Bertaut's "pink vaccination/immunization card" kept at the health unit was marked to indicate that either of them received the swine flu shot;

(6) Although Mrs. Bertaut testified that Mr. Bertaut was in the same room when she got her vaccination, Mr. Bertaut admitted that he did not actually see Mrs. Bertaut get the vaccination; and

(7) Although Mrs. Bertaut was hospitalized in December 1976 for respiratory problems, she failed to tell her treating and consulting doctors (Drs. Frank Guidry, Dr. Wayne Buffat, Dr. Jack Diamond and Dr. Leon Weisberg) that she had received the swine flu vaccine on December 7, 1976.

2. Mrs. Bertaut claims that from 1976 through 1989, none of her physicians told her of a relationship between her purported GBS and her alleged swine flu vaccination. However, the court notes that on *August 26, 1982*, Mrs. Bertaut gave Dr. Culpepper the following history:

Thirty-four years old. Strange history. In 1976 had numb legs, bilateral and left face and extremity weakness earlier with very red scaly cheeks of the face. In hospital with no tests done. Discharged. Finally to Tulane M.D. who was going to check nerves with needles, but she improved so she didn't follow through with this. Whole thing went on six weeks. *Says it all actually began after asthma attack and pneumonia and three weeks before that swine flu and another flu shot.*

(See Trial Ex. K–3, p. 282, emphasis added, and Dr. Culpepper's deposition, pp. 7, 29, 33).

In **January 1983**, Dr. Paul Richards from Ochsner wrote Mrs. Bertaut advising her that her illness in 1982 "may" have been due to a Guillain–Barre type syndrome. (See Trial Ex. K–8, p. 672).

Dr. Thomas Krefft testified at Trial that Mrs. Bertaut gave him a history on **March 25, 1986** which included: *"patient says she had numbness of both legs in 1977 after swine flu shot."* (See also Trial Ex. C–2, p. 458, emphasis added).

Dr. Miguel Culasso testified (by deposition) that on or about **February 3, 1989**, Mrs. Bertaut gave him a history of Guillain–Barre. (See Dr. Culasso's deposition, pp. 34–35 and Trial Ex. D–2).

Dr. Wendy Jamison testified (by deposition) that on or about **February 21, 1989** she took a history from Mrs. Bertaut and had the impression that Mrs. Bertaut thought her pneumonia and weakness were related to a purported swine flu shot. (See Dr. Jamison's deposition, pp. 53–54, 56 and Trial Ex. E–1, p. 726).

In September 1989, Mrs. Bertaut gave Dr. Daniel Trahant a history that she had been told that she had a Guillain–Barre Syndrome following her admission and work-up at Ochsner in 1982. (See Trial Exs. F–1 and N–3).

result of the alleged swine flu vaccination is likewise legally insufficient to meet her burden of proof.

10. The cause of GBS in unknown but it usually is triggered by some type of antecedent event, such as a respiratory or gastrointestinal infection and surgery. The swine flu vaccine is also known to be statistically associated with GBS. A recurring episode of GBS is rare, and multiple recurring episodes of GBS are even rarer. Drs. Patricia Cook, Charles Poser and Barry Arnason (neurologists) testified that recurring GBS cases comprise only 1–5% of all GBS cases.[3]

11. Before December 1976, Mrs. Bertaut had a history of asthma which on occasion required treatment with subcutaneous epinephrine.

12. Although there is no laboratory test (biochemical or electrodiagnostic) which conclusively diagnoses GBS,[4] the overwhelming medical evidence and testimony presented at Trial indicates that GBS is *not* difficult to diagnose, even when it is in a chronic recurring stage. In response to the court's inquiry, Dr. Wayne Buffat, an internist, explained that in today's world of specialized medicine, many physicians "defer" to neurologists for the diagnosis and/or treatment of GBS, but GBS is relatively easy to diagnose, even by internists such as himself, based upon the patient's clinical presentation of ascending paralysis and diminished reflexes.

13. Two particular symptoms are required for diagnosing GBS: (1) progressive motor weakness of the lower extremities; and (2) areflexia or diminished reflexes.

14. While these two "required" symptoms, along with other "supportive" symptoms, were identified by the National Institute of Neurological and Communicative Disorders and Stroke ("NINCDS") in 1978 to help physicians recognize the syndrome's diagnostic boundaries (Trial Ex. CC–5), these two required symptoms were well known and routinely used by physicians *before 1978* in diagnosing GBS.

15. The *first* required symptom in diagnosing GBS, i.e., progressive motor weakness, may vary in degree and affects more than one limb, usually the lower extremities but sometimes all four limbs. GBS is also known as "ascending paralysis" as the weakness or paralysis is known to travel upwards in the lower extremities.

16. The *second* required symptom in diagnosing GBS, i.e., areflexia or diminished reflexes, is an objective measurement made by the clinician. A normal reflex is measured at 2+; areflexia is measured at 0+; a diminished reflex is measured at 1+; and a hyper-reflex is measured at 3+. In response to the court's inquiry, Dr. Frank Guidry explained that different, trained physicians would report the same measurement of a given patient's reflexes if these physicians would be asked to measure the reflexes at a given time. In other words, one would *not* expect reflex measurements to vary from physician to physician.

17. Other symptoms or features which may be helpful in diagnosing GBS include: various sensory changes; protein in the cerebrospinal fluid; abnormal electrodiagnostic tests such as an electromyogram and nerve conduction test.

18. On December 25, 1976, Mrs. Bertaut presented at Slidell Memorial Hospital ("SMH"), complaining of extreme weakness. (Trial Exs. H 1–4, SMH medical records). She was treated by Dr. Frank Guidry (family practitioner), who consulted Dr. Wayne Buffat (internist). These physicians were unable to detect any objective findings of weakness or reflex abnormality.

Dr. Guidry testified that Mrs. Bertaut's complaints of difficulty in walking were inconsistent with her ability to get in and out of bed without difficulty, and her reflexes were 3+. (Trial Ex. H–4, Progress note of

---

3. Dr. Arnason testified that he has seen approximately 300 cases of GBS and is aware of only two multiple recurring cases of GBS: one patient had five relapses but that was over fifty years ago; and one case reported in the literature involved a patient in Australia who had six relapses.

4. However, some laboratory testing may be helpful in making a diagnosis of GBS. Dr. Arnason testified that 80% of GBS cases have abnormal protein and 80% of GBS cases have abnormal electrodiagnostic tests.

12/29/76). Dr. Buffat reported her reflexes were 3+ and he found "no evident muscle weakness." (Trial Ex. H–3, p. 238).

Mrs. Bertaut was discharged on December 31, 1976, after she was "considerably better." She was never diagnosed with GBS; her final diagnosis was "acute bronchitis and asthma."

19. On January 12, 1977, Dr. Leon Weisberg (neurologist) saw Mrs. Bertaut on neurological consult from Dr. Jack Diamond, who was Dr. Guidry's partner. At that time, Dr. Weisberg reported in part:

> Neurological examination: ... Gait: The patient can rise from a chair but uses her hands to rise from the chair. The patient can walk on her heels and toes without assistance, but staggers slightly. The base is normal. Motor: In the lower extremities, there is no evidence of wasting or atrophy. The patient has a diffuse weakness, but when each muscle is specifically tested it is about 80% degree of function proximally and distally....
>
> Reflexes: In the lower extremities, the knee jerks are 3+ and slightly pendular, and ankles are 2+. Bilateral plantar flexor response.... Sensory: The patient appreciates pinprick, light touch, vibration, and position sense normally in all four extremities, although the patient claims that she is numb in her lower extremities, she feels the pin as a pin and the directional seems normal....
>
> Impression: It is *possible* the patient developed some demyelinating disorder while in the hospital which caused numbness and weakness in the lower extremities such as a transverse myelitis, or that the patient had a demyelinating form of a neuritis. *But, in the absence of any reflex changes, sensory or real motor dysfunction, it is slightly disturbing for either these diagnoses. It is possible that there is a functional overlay to this disorder, but I think that an EMG with nerve conduction times and measurements of muscle potentials would be indicated and this has been scheduled.*

(Trial Exhibit B 1, Dr. Weisberg's report, emphasis added). Dr. Weisberg only saw Mrs. Bertaut this one time, and Mrs. Bertaut admitted that she did not have the tests that Dr. Weisberg recommended because she was feeling so much better.

At trial, Dr. Weisberg testified that in his opinion Mrs. Bertaut "probably" had GBS when he saw her in 1977. However, this testimony is not only inconsistent with the substance of his report quoted above, it is also markedly inconsistent with his deposition testimony of February 18, 1993, when he testified:

> A. Remember, my testimony deals with that I had a clinical impression of the diagnosis of a demyelinating form of a neuritis, which translates out into a inflammatory, demyelinating polyneuropathy. Now, the diagnostic tests that I wanted to do were not performed. So I had a clinical impression.
>
> Q. I see.
>
> A. This was a clinical impression. *I did not make this diagnosis.* I said that this patient needs to be evaluated.
>
> Q. I see.
>
> A. *I was perplexed* and I did not have any diagnostic tests and I never got them.
>
> Q. *You couldn't make a conclusion without those diagnostic tests?*
>
> A. *That is correct.*
>
> Q. Okay.
>
> A. But I reached a different opinion than other people who thought this was psychiatric. I had a concern about a neurological illness, and I had findings which really suggested that these diagnostic tests were really warranted and needed to be done.
>
> Q. And since you couldn't make a conclusive diagnosis of your clinical impressions without those diagnostic tests, as you've just stated, *that's why you worded your January 12th [1977] letter in terms of a possibility rather than a probability?*
>
> A. *That's correct.*

(Dr. Weisberg's deposition of February 18, 1993, pp. 61–62, emphasis added).[5]

---

5. Dr. Weisberg's deposition of February 18, 1993 was used for impeachment purposes and the court has caused it to be filed into the record in its entirety.

Dr. Weisberg also testified at Trial that his "diagnosis" of GBS was based upon Mrs. Bertaut's symptoms of (1) weakness and (2) loss of reflexes. But in his report, he states there was "the absence of any reflex changes," and in his deposition of February 18, 1993, Dr. Weisberg admits that Mrs. Bertaut's 3+/2+ reflexes only raised the "possibility" of meeting the diminution of reflex criteria. (Dr. Weisberg's deposition of February 18, 1993, pp. 110–11).

Dr. Diamond, to whom Dr, Weisberg's report is addressed, testified that 3+/2+ reflexes are "perfectly normal." (*See* Dr. Diamond's deposition, p. 22). Further, even Plaintiff's expert, Dr. Poser, conceded that 3+/2+ reflexes were normal. (*See* Dr. Poser's deposition, p. 89).

In his 1977 report, Dr. Weisberg gives two "possible" diagnoses: (1) a demyelinating disorder which he admittedly finds "slightly disturbing" because there was an absence of reflex changes and sensory or real motor dysfunction; and (2) functional overlay. However, at Trial, Dr. Weisberg completely abandoned his 1977 concern that a "possible" diagnosis of demyelinating disorder would be "slightly disturbing" when he endorsed a "probable" diagnosis of GBS. At the same time, he dismissed his earlier, but equally possible, diagnosis of functional overlay with the excuse that he was a mere junior faculty member back in 1977.

Again, Dr. Weisberg only saw Mrs. Bertaut that one time in 1977. With regard to whether Mrs. Bertaut had "recurring" or "relapsing" GBS post–1977, Dr. Weisberg only testified that it was "possible."

20. On November 29, 1982, Mrs. Bertaut again presented at SMH, complaining of extreme weakness. (Trial Exs. J 1–4, SMH medical records). She was treated by Dr. Buffat, who consulted Dr. Debra Burris (neurologist). These physicians again were unable to detect any objective findings of weakness or reflex abnormality.

Dr. Buffat reported "no focal, motor, or sensory deficit" and "no pathological reflexes." (Trial Ex. J–1, p. 115). Dr. Buffat testified that he wanted to rule out systemic lupus erythematosus or myasthenia. He never diagnosed Mrs. Bertaut as having GBS, which he said was "easy" to diagnose and it did not have to be diagnosed by a neurologist.

Upon neurological examination, Dr. Burris found that Mrs. Bertaut had normal strength in all extremities (there was no ascending paralysis) with normal to brisk reflexes. Dr. Burris testified that these findings are incompatible with a diagnosis of GBS, which requires a history of acute ascending paralysis from the feet and usually complete loss of reflexes or certainly diminution of reflexes. She ordered the Minnesota Multiphasic Personality Inventory (MMPI), which was completed on December 3, 1982. (Trial Ex. C–3, MMPI). *See* discussion of the MMPI results in Finding No. 21).

Mrs. Bertaut was discharged from SMH on December 5, 1982, with a final diagnosis of "generalized weakness of undetermined etiology." (Trial Ex. J–1, p. 115).

21. On December 10, 1982, Mrs. Bertaut presented at Ochsner Hospital, complaining of extreme weakness. (Trial Exs. K 1–10, Ochsner medical records). She was discharged on December 14, 1982, after physicians again were unable to detect any objective findings of weakness or reflex abnormality. She was not diagnosed with GBS. (*See* Depositions of Drs. Mark Stephan, James McCullough, Paul Richards, and Walter Culpepper).

Dr. Alvin Rouchell (psychiatrist), who saw Mrs. Bertaut on December 13, 1982, testified that there was no physical explanation or medical support for Mrs Bertaut's complaints. (*See also*, highlighted portions of Depositions of Dr. Mark Stephan, Dr. Paul Richards, Dr. Walter Culpepper, Dr. James McCullough). Dr. Rouchell's clinical impression was that Mrs. Bertaut had an "hysterical personality" with "conversion symptoms," and this clinical impression was strongly supported by the MMPI (Trial Ex. C–3) that Dr. Burris had ordered. Dr. Rouchell explained that the MMPI is the most accepted psychological test which is largely objective requiring little subjective interpretation.

22. In March 1986, Mrs. Bertaut was seen on neurological consult by Dr. Thomas

Krefft (neurologist). (Trial Ex. C–2). At this time, Mrs. Bertaut did not complain of weakness and Dr. Krefft found no weakness on examination. Mrs. Bertaut's reflexes were "normal to a little hyper," and certainly not diminished. Electomyograms ("EMG's") and nerve conduction tests were performed to rule out Thoracic Outlet Syndrome and cervicular radiculopathy, and all of these tests were normal. Dr. Krefft did not diagnose Mrs. Bertaut as having even an atypical form of GBS, as Mrs. Bertaut simply did not have the requisite signs for this syndrome.

23. In February and March 1989, Mrs. Bertaut was evaluated by Dr. Wendy V. Jamison (neurologist). Dr. Jamison testified by deposition and stated that it was only "possible" that Mrs. Bertaut had GBS in 1976. (*See* Dr. Jamison's deposition, p. 42). She did not diagnose Mrs. Bertaut with GBS in 1989.

Dr. Jamison's partner, Dr. Patricia Cook (neurologist) re-evaluated Mrs. Bertaut in March 1989 and she testified in person at Trial. (Trial Ex. E–1, Medical records of Drs. Jamison and Cook). Dr. Cook explained that she reviewed Mrs. Bertaut's records before and after the alleged December 1976 swine flu vaccination and found that Mrs. Bertaut never lost reflexes and although Mrs. Bertaut complained of weakness, there was no objective evidence of weakness. Dr. Cook testified that Dr. Jamison never diagnosed Mrs. Bertaut as having GBS. Further, Dr. Cook herself was of the opinion that Mrs. Bertaut never had GBS. In fact, Dr. Cook found that Mrs. Bertaut had no neurological disease.

24. On September 7, 1989, Mrs. Bertaut presented at St. Charles Hospital, complaining of extreme weakness. (Trial Ex. N 1–4, St. Charles General Hospital medical records). She was seen by Dr. Daniel Trahant (neurologist) who also testified that GBS is not difficult to diagnose and that he himself has diagnosed GBS, but has never seen recurrent GBS.

With regard to Mrs. Bertaut, Dr. Trahant testified that it was unclear if Mrs. Bertaut had genuine weakness, but she definitely had normal (2+) reflexes and normal cerebrospinal fluid, which abnormally contains protein in up to 80% of GBS cases. Dr. Trahant found no organic cause for Mrs. Bertaut's complaints and he testified that she did not have GBS based on both her clinical and laboratory evaluation; he put great weight on the fact that Mrs. Bertaut did not have decreased reflexes. Dr. Trahant also testified that he reviewed Mrs. Bertaut's earlier medical record and that in his opinion Mrs. Bertaut did not have GBS in 1976 as well because her reflexes were normal.

25. Historically, Mrs. Bertaut complained to several physicians of some symptoms which pre-dated her alleged swine flu vaccination of December 1976. For instance, in September 1974, she was hospitalized, "complaining of vague lower quadrant pain and mid-epigastric abdominal pain and weakness." (*See* Trial Ex. R 1–3). In January 1975, she was hospitalized, complaining of sore throat, fever, nervousness, nausea, cough and progressive weakness. (*See* Trial Ex. S 1–4). In November 1982, she gave Dr. Burris a history of weak spells for the last ten years. (*See* Trial Ex. C–1, p. 455). In December 1982, she gave Ochsner physicians a history of fever and weakness "off and on for the past nine years." (*See* Dr. Paul Richards' deposition, pp. 35–36, and Trial Ex. K–10, p. 367). In February 1989, she gave Dr. Jamison a history of "periodic weakness in her legs which first occurred about fifteen years ago." (*See* Trial Ex. E–1, p. 726). In September 1989, she gave Dr. Trahant a history of experiencing "weakness in the legs and, to a lesser extent, in the remainder of her body" fifteen years ago. (*See* Trial Ex. N–3, p. 377).

26. In addition to Dr. Rouchell (psychiatrist), Drs. Guidry and Diamond (general practitioners) and Dr. Cook, Dr. Burris, and Dr. Trahant (neurologists) all testified that the lack of objective findings suggested that there was an emotional component or functional overlay to Mrs. Bertaut's symptoms. (*See* Dr. Diamond's deposition, p. 22; Drs. Guidry, Cook, Burris and Trahant testified in person at Trial).

27. Of Mrs. Bertaut's *sixteen* treating and/or consulting physicians who testified at

Trial (either by deposition or in person),[6] only Dr. Weisberg testified that, in his opinion, Plaintiff probably had GBS in 1977. However, because Dr. Weisberg's Trial testimony is so inconsistent with his February 18, 1993 deposition testimony and his 1977 report (*see* Finding No. 19), together with overwhelming opinion of Mrs. Bertaut's other treating and/or consulting neurologists that Mrs. Bertaut never met the requisite criteria (i.e., progressive motor weakness of the lower extremities and diminished reflexes) for a diagnosis of GBS, the court finds Dr. Weisberg's Trial testimony unpersuasive even though he was the only neurologist who saw Mrs. Bertaut in January 1977.

As pointed out in Finding No. 12, GBS is not difficult to diagnose and Mrs. Bertaut was seen by both Dr. Guidry (family practitioner) and Dr. Buffat (internist) in December 1976 and neither of these physicians diagnosed Mrs. Bertaut with GBS. (*See* Finding No. 18). Further, Dr. Cook (neurologist) and Dr. Trahant (neurologist), both testified that they reviewed Mrs. Bertaut's earlier medical records, including Dr. Weisberg's 1977 report, and were of the opinion that Mrs. Bertaut did not have GBS in 1976 or 1977. Dr. Cook pointed out that Dr. Weisberg's report did not describe the requisite weakness and loss of reflexes for a diagnosis of GBS and it contained several incongruities. Finally, Dr. Diamond (general practitioner), to whom Dr. Weisberg addressed his 1977 report, testified that he would not "defer" to Dr. Weisberg because of discrepancies contained in that report. (*See* Dr. Diamond's deposition, pp. 21–22, 40–41).

28. Plaintiff's expert, Dr. Charles Poser, testified via video deposition for Trial purposes, and opined that Mrs. Bertaut has chronic recurrent GBS initiated by a consequence of the swine influenza vaccination she received on December 7, 1976. (*See* Dr. Poser's deposition, p. 27). Dr. Poser explained that the criteria he uses for diagnosing GBS includes the fairly rapid development of symmetrical weakness and/or sensory complaints, often accompanied by decreased reflexes, more commonly involving the lower extremities than the upper extremities. (*See* Dr. Poser's deposition, pp. 99–100).

Dr. Poser testified that his opinion was based to a large extent on the reports and the deposition testimony of Dr. Weisberg. (*See* Dr. Poser's deposition, p. 29). However, although Dr. Poser testified that he relied on Dr. Weisberg's report, he then proceeded to criticize it.

First, Dr. Poser testified that Dr. Weisberg contradicted himself in his description of Mrs. Bertaut's muscle weakness and his impression of her real motor dysfunction. (*See* Dr. Poser's deposition, p. 86). Then, Dr. Poser testified that Dr. Weisberg's reflex differential of $3+/2+$ is "normal" and Dr. Poser did "not particularly" attach importance to that differential in making his diagnosis. (*See* Dr. Poser's deposition, p. 89). However, Dr. Weisberg testified at Trial that this $3+/2+$ differential sufficiently constituted "diminished reflexia" in his opinion.

In conclusion, the court discounts Dr. Poser's opinion finding it to be incongruous because Dr. Poser stated that he heavily relied on Dr. Weisberg's report, but then criticized its inconsistencies.[7] Further, the court found Dr. Weisberg's Trial testimony to be unpersuasive especially in view of the unexplained inconsistencies with his prior deposition and report. (*See* Finding No. 27).

29. Defendant's expert, Dr. Barry Arnason, testified that he has been interested in GBS since 1960, he has seen approximately

---

**6.** The following treating/consulting doctors testified in person at Trial: Drs. Frank Guidry, Wayne Buffat, Patricia Cook, Leon Weisberg, Debra Burris, Thomas Krefft, Daniel Trahant, and Alvin Rouchell.

The following treating/consulting doctors testified by deposition: Drs. Jack Diamond, Wendy Jamison, Ignatius Thomas, Miguel Culasso, James McCullough, Walter Culpepper, Paul Richards, and Mark Stephan.

Plaintiff's expert, Dr. Charles Poser, testified by video deposition and Defendant's expert, Dr. Barry Arnason, testified in person.

**7.** In contrast, Dr. Diamond criticized the inconsistencies in Dr. Weisberg's report and accordingly refused to defer to Dr. Weisberg. Similarly, Dr. Cook criticized the incongruities in the report and accordingly rejected it in forming her conclusion that Mrs. Bertaut did not have GBS in 1976. (*See* Finding No. 27).

300 cases of GBS, and he was a member of the committee that published the NINCDS criteria for the diagnosis of GBS. In formulating his opinion that it is "extremely unlikely" that Mrs. Bertaut ever had any form of GBS, Dr. Arnason reviewed Mrs. Bertaut's pre–1976 medical records, her December 1976 medical records, her post–1976 medical records, Dr. Weisberg's 1977 report, Dr. Poser's reports, and various depositions.

Dr. Arnason testified that Mrs. Bertaut never had the requisite progression of weakness or reflex loss to justify seriously entertaining a diagnosis of GBS. Again, Dr. Arnason testified that he has seen approximately 300 cases of GBS, but that he has never diagnosed a case of GBS where the patient's reflexes were 3+/2+ (which were Mrs. Bertaut's reflex measurements as reported by Dr. Weisberg in 1977), nor does he know of any such case reported in the literature. In fact, 90% cases of GBS patients have *no* deep tendon reflexes in their arms and legs. Thus, he is very wary of a GBS diagnosis if reflexes are preserved. (As previously noted by this court, the overwhelming medical testimony in this case substantiates that Mrs. Bertaut had normal to increased reflexes).

The court found Dr. Arnason's testimony and opinion impressive and strongly corroborated by all of Mrs. Bertaut's *sixteen* treating and/or consulting physicians, with the sole exception of Dr. Weisberg.

30. At best, the evidence shows that Mrs. Bertaut only "possibly" had GBS. Plaintiff has failed to prove by a preponderance of the evidence that she ever had GBS rather than some other equally (if not more) plausible diagnosis, including pneumonia, a viral condition, chronic fatigue syndrome, an upper respiratory infection, allergies, asthma, complications from asthmatic medication, depression, and anxiety.

30. Because Plaintiffs have failed to prove by a preponderance of the evidence that Mrs. Bertaut ever had GBS, whether the acute or the recurring form, much less that she developed GBS as a result of a swine flu vaccination that she allegedly received in December 1976, the court concludes that Defendant is not liable and Plaintiffs are accordingly not entitled to damages.

31. Judgment will be rendered in favor of Defendant and against Plaintiffs, dismissing Plaintiffs' claims at their costs.